**DECLARATION**

I, Trevor Mayes, pursuant to Title 28, United States Code, Section 1746, under penalty of perjury and pursuant to the laws of the United States, state that the following is true and correct to the best of my knowledge, information, and belief:

1. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and have been so employed since April of 2023. I am a graduate of the Federal Law Enforcement Training Center Uniformed Police Training Program, Criminal Investigator Training Program, as well as the ATF National Academy, where I received extensive training in the investigation of firearms, controlled substances, arson, and explosives offenses.

2. Prior to my career with ATF, I was employed as a law enforcement officer with the Pentagon Force Protection Agency ("PFPA") since 2020. Within that role, I enforced laws according to the Code of Federal Regulations and the Virginia State Code. While working for PFPA, I made arrests, collected and preserved evidence, conducted suspect and witness interviews, and more. I have a Bachelor of Science Degree in Homeland Security from East Coast Polytechnic Institute Virginia Beach, Virginia.

3. During my career with ATF, I have conducted and participated in case investigations involving violations of the Gun Control Act and the National Firearms Act. Those violations include firearms possession by prohibited persons, straw purchasing,

EXHIBIT
A

unlicensed dealing of firearms, trafficking of firearms, machinegun manufacturing, etc. In furtherance of these investigations, I have utilized multiple investigative techniques including but not limited to physical and electronic surveillance, controlled purchases of evidence, management of confidential informants, examination of electronic evidence, and the seizure of electronically stored communications. I have experience and/or training on monitoring and gathering information received from pen register and/or trap and trace device, real time GPS and geo-location information, and historical call detail records. I have participated in the execution of search warrants authorizing the seizure of evidence in criminal investigations. Through this experience, I have been able to successfully gather criminal intelligence and utilize this information in furtherance of ongoing criminal investigations.

4. This Declaration is submitted in support of a Verified Complaint of Forfeiture of the assorted firearms and associated ammunition ("Assorted Firearms") more specifically described on Schedule 1.

5. The facts and circumstances set forth in this Declaration are based upon information provided by other law enforcement officers and my own personal knowledge and experience. Since this Declaration is being submitted for a limited purpose, I am not including all the facts and information which I have learned about or obtained during the investigation.

6. Based on the investigation described below, there is probable cause to believe the Assorted Firearms were involved in or used in knowing violations of 18 U.S.C.

§ 922(a)(6) and/or 18 U.S.C. § 922(g)(4), and are therefore subject to forfeiture pursuant to 18 U.S.C. § 924(d).

## **Legal Framework**

7. ATF regulates the firearm industry. As part of that, the ATF issues licenses to business and individuals authorizing them to sell firearms for profit. Pursuant to 18 U.S.C. § 923, only a Federal Firearms Licensee ("FFL") is permitted to sell firearms as a business.

8. ATF Form 4473 (Firearms Transaction Record) requires a purchaser to provide several pieces of information to lawfully buy a firearm from an FFL. Among them, the purchaser must provide their name and address. At question 11(a) on the Form 4473, the purchaser must sign their name to certify that they are the "actual" buyer of the firearm. Form 4473 contains a warning that reads: "You are not the actual transferee/buyer if you are acquiring the firearms(s) on behalf of another person."

9. Pursuant to 18 U.S.C. § 922(a)(6), it is unlawful for any person "in connection with the acquisition or attempted acquisition of any firearm or ammunition" from an FFL or other legitimate firearms dealer to knowingly make "any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive" the firearm seller "with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition[.]" In other words, it is a crime to lie about a material fact on the Form 4473.

10. When a purchaser is buying a firearm for another person but falsely certifies on the Form 4473 that he or she is purchasing the firearm for himself or herself, the practice is commonly referred to as "straw purchasing."

11. Pursuant to 18 U.S.C. § 922(g)(4), it is unlawful for any person "who has been adjudicated as a mental defective or who has been committed to a mental institution" to possess, in or affecting commerce, any firearm or ammunition, or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

12. Any firearm or ammunition involved in or used in any knowing violation of 18 U.S.C. § 922(a)(6) or (g) is subject to forfeiture pursuant to 18 U.S.C. § 924(d).

**Investigation**

13. On or about January 6, 2025, I was assigned an investigation on Margaret WALL ("WALL") that originated from a lead generated by the Charlotte IV Crime Gun Intelligence Center. According to the lead, Industry Operations Investigator ("IOI") Joshua Saghy was conducting a pre-inspection of Colfax Guns and Ammo, an FFL, located at 9420 West Market Street, Colfax, North Carolina, when he noticed suspicious activity.

14. IOI Saghy noticed that WALL had purchased over fifty (50) firearms from various FFLs in the Greensboro area. It was discovered that there are several "Report of Multiple Sale or Other Disposition of Pistols and Revolvers" (ATF Form 3310.4) for WALL. A multiple sale is defined as the purchase of two or more handguns (or one handgun and one long gun) in a single transaction, or during five consecutive business days. According to an employee of Colfax Gun and Ammo, WALL had previously stated that she purchases the firearms for her father; however, according to an online obituary, WALL's father has been deceased since 2005.

15. Sales receipts indicate that WALL has spent over $10,000 on firearms, despite WALL's wage report from the NC Department of Employment Service showing

WALL made less than that in 2023 while working for Quality Home Staffing Inc. During the investigation, wage reports showed WALL was still employed by the same company and was projected to earn about the same in 2024.

16. I conducted a search of the National Tracing Center database (eTrace) and discovered that WALL has sixteen (16) multiple firearm sales, totaling forty-six (46) firearms. I also reviewed WALL's ATF Form 4473's from Colfax Gun and Ammo, and one firearm pawn ticket from West Mountain Pawn, an FFL in Kernersville, North Carolina. Upon reviewing said information, I identified more firearm purchases, bringing the total known number of firearms purchased by WALL to approximately sixty-three (63). At the time, all of WALL's firearms were purchased from March 2024 to December 2024. Furthermore, I reviewed several sales receipts from Colfax Gun and Ammo and learned that most firearms purchased by WALL cost around $200-$300, and that WALL usually pays with cash.

17. On or about January 8, 2025, I identified a Facebook account for WALL. WALL indicated on her profile that her father passed away in 2005. On the same day, I spoke to IOI Saghy to see if he had any additional information about WALL. According to IOI Saghy, one of the FFL owners at Colfax Gun and Ammo, told him that WALL stated that that she purchased the guns for her father, "Lonnie." I later identified Lonnie as Lonnie Gray VOGT ("VOGT") who resides on Mountain View Drive in Kernersville, North Carolina. Additionally, the FFL told IOI Saghy that sometimes VOGT goes with WALL

when she purchases firearms, and that on at least one occasion, VOGT may have directed WALL on what firearm to purchase.

18. Through my training and experience, I know it is common for a straw purchaser to buy many firearms of the same make, model, and caliber. Straw purchasers typically receive cash from the person for which they are buying the firearms. Often, the recipients of straw purchased firearms are present during the firearms transactions. It is common for prohibited persons who cannot legally purchase firearms to obtain firearms through straw purchases. Additionally, it is generally known that law enforcement can trace firearms back to the original purchaser. With that said, persons who are not prohibited but intend to use a firearm in a criminal offense sometimes obtain firearms through straw purchases as a way of not being identified by law enforcement.

19. With WALL's firearm purchase activity and public comments, amongst other things, I developed reasonable suspicion that WALL may be conducting straw purchases for VOGT, or that WALL and VOGT may be engaged in another type of illegal firearm scheme.

20. On January 10, 2025, I called LuxFirearms, located at 806 F HWY 66 South, Kernersville, North Carolina 27284. I informed the manager, that I would like to discuss an individual that has purchased some firearms from his store. When I arrived at LuxFirearms. I spoke to an employee that manages the records and ATF forms.

21. The employee said WALL frequently purchases firearms and is always with an "older man named Lonnie" who WALL says is her father. The employee said they do not have a lot of frequent customers that buy the number of firearms as WALL. The

employee further said that VOGT has called the store on occasion and that the name that comes up on the caller ID is "Lonnie Vogler."

22. The employee's statements were further corroborated by a second employee of LuxFirearms,. The second employee believed WALL and VOGT arrive to the store together in a van. The second employee then showed me the Facebook profile of Colfax Pawn and Ammo, with a posted picture of VOGT (see below).




23. I also spoke to the store manager, who confirmed that VOGT is always with WALL when she purchases firearms. The store manager stated that VOGT will usually call the store to see what firearms are on sale and would frequently try to negotiate for the cheapest price. The store manager explained that after VOGT calls to inquire about firearms, VOGT will arrive at the store with WALL. The store manager further stated that

they usually look at a firearm together, and then VOGT asks WALL if that is the firearm she wants, in a suggestive way, as if directing WALL on which gun to buy. The store manager also said WALL would pay for the firearm[s].

24. Store records show that WALL purchased a total of twenty (20) firearms from May 16, 2024, to November 26, 2024.

25. Later that day, I searched several law enforcement databases but was unable to find a positive match for the name "Lonnie Ray Vogler." On January 13, 2024, I accessed the ATF National Instant Criminal Background Check System (NICS) Referral Application (ANR). ANR is a system that allows ATF investigators to see if an individual was ever denied a firearm transaction due to a prohibiting factor. I searched for firearm transaction denials that occurred in the ATF Charlotte Field Division area with the first name "Lonnie" and the last name beginning with "V".

26. The ANR search revealed two separate denials for VOGT. The first one (NTN # 102WRYD8S) occurred during an attempted handgun purchase on April 9, 2023, at West Mountain Pawn, an FFL located at 214 West Mountain Street, Kernersville, North Carolina 27284. The second denial (NTN # 10346YPMK) occurred during an attempted handgun purchase on November 30, 2023, also at West Mountain Pawn. WALL purchased at least four (4) firearms from that same FFL as early as March 2024.

27. Further review of the said firearm transaction denials revealed that VOGT was denied due to 18 U.S.C. § 922(g)(4) - Adjudicated Mental Defective. VOGT was entered into the NICS Index on March 19, 2016, by Originating Agency Identifier (ORI) DCVA02000. That ORI belongs to the Department of Veterans Affairs (DVA). Further

investigation confirmed that on or about December 23, 2005, VOGT was adjudicated as a mental defective, as used in Title 18 U.S.C. § 922 and defined in 27 C.F.R. § 478.11, by the DVA.

28. On or about January 14, 2025, I went to LuxFirearms, to retrieve copies of WALL's ATF Form 4473's.

29. On the same day, I went to West Mountain Pawn and spoke to one of the managers. that the manager recalls VOGT was denied a firearm transaction and that he specifically remembered VOGT because VOGT collects guitars and sold about 15 guitars to the store. After being denied, VOGT went back to West Mountain Pawn to try to purchase another firearm. According to the manager, VOGT claimed that he got everything resolved with the ATF regarding his earlier denial, but he was unable to provide any documentation to that effect.

30. The manager further explained that WALL purchased firearms from his store after VOGT's firearm transaction denials; however, VOGT was not with WALL for those purchases. The manager remembered VOGT referring to WALL either as his daughter and/or his nurse. On one occasion, VOGT called the store to inquire about a Glock that was for sale and claimed that his daughter was interested in buying it. The manager suspected that WALL was straw purchasing firearms for VOGT so he banned WALL from the store.

31. On February 12, 2025, at approximately 4:15pm, Special Agent (SA) Jacob Hudson and I met WALL in Kernersville, North Carolina to discuss her firearm purchases. WALL said she works part time as an in-home health aide. WALL explained that she has

one patient, VOGT, and that VOGT is a veteran. WALL said she sees VOGT four times per week (Mondays, Wednesdays, Thursdays, and Fridays) from 12:00pm to 4:00pm.

32. I asked WALL about her firearm purchases. WALL claimed she bought approximately thirty (30) firearms, and that she is a collector. WALL stated her aunt does not like firearms, so WALL stores them in safes at a friend's house. While she was explaining this, I noticed that her voice was shaky, as if she was very nervous. I asked WALL if her friend would be willing to allow me to look at her firearms. WALL replied, no.

33. I then asked WALL to estimate how much money she spent on firearms in total. WALL estimated that she spent $1,000 to $3,000 on firearms but said she does not know how much she has spent in total.

34. I informed WALL that I believed she was lying. WALL admitted that the firearms she bought were all at VOGT's house. When I asked why the firearms were at VOGT's house, WALL said it was because she had nowhere else to store them. WALL then said VOGT provided her with the money to buy the firearms and claimed they all belonged to her.

35. I confronted WALL about not telling the full truth. WALL changed her statement again and said that she bought the firearms for VOGT. WALL said she bought

them for VOGT because VOGT is unable to read or write. WALL claimed she does not make money or get

36. anything out of buying the firearms for VOGT. When asked why she does it, WALL replied "I don't know, I guess I'm dumb."

37. I asked WALL if she knew VOGT had a fiduciary who manages his money. WALL said that she believed VOGT's oldest daughter, was his fiduciary. I asked WALL if she knew if the VA told VOGT he could not purchase firearms, and WALL claimed she did not.

38. I talked to WALL about West Mountain Pawn and how she was banned by the manager due to the suspicion of straw purchasing for VOGT. WALL said that she and VOGT just stopped going there and she did not know that she was banned from the business.

39. I asked WALL about the firearms purchases at Colfax Gun and Ammo. WALL said that she normally deals with the owner. WALL said Colfax Gun and Ammo knows that VOGT cannot fill out the paperwork (ATF Form 4473) because VOGT cannot read or write. WALL further stated that Colfax Gun and Ammo was fine with her filling out the paperwork.

40. I asked WALL to explain how the firearm transactions occurred. WALL said that VOGT would usually call the firearm stores to see what was on sale. After that, WALL would drive VOGT to the store using his van. WALL explained that they went into the store together to look at the firearms. WALL said that VOGT would tell her which firearms to buy. As far as payment, WALL said VOGT would either give her the money before

entering the store or while they were inside the store. WALL said that VOGT would sometimes pay for the firearms himself.

41. WALL said she and VOGT stopped going to LuxFirearms because they treated VOGT badly. When asked to elaborate, WALL said VOGT, "purchased a firearm and they wouldn't come down on the price." WALL further said VOGT did not like the way he was treated so he called the owner and told him he would not be back. I asked WALL if VOGT bought the firearm, to which WALL said "mmhm" and shook her head up and down in agreement. I then asked if VOGT filled out the paperwork. WALL took and long pause, began to say something, then said "I can't remember, honestly." SA Hudson asked WALL if she was getting any type of compensation from VOGT. WALL claimed that she does not and that she only does it because VOGT asked her to do it. SA Hudson asked WALL what VOGT does with the firearms. At first WALL said VOGT might be selling them to his "buddies." WALL then said that on approximately 5-8 transactions, she drove VOGT in his van so he could sell firearms to his friend, Gilley. WALL further stated

the firearms transactions always occurred at Gilley's business in Summerfield, North Carolina.

42. WALL stated that when she started working for VOGT, there was a safe in his house that had at least two firearms in it. WALL later said there are now four safes at VOGT's house full of firearms.

43. Before the interview concluded, I served WALL with a Warning Notice of Straw Purchasing. WALL agreed that she would not reveal to VOGT that there is an ongoing investigation.

44. On February 13, 2025, I received a phone call from WALL's supervisor at Quality Home Staffing. The supervisor informed me that WALL told her VOGT has firearms in his house and that WALL no longer felt comfortable working for VOGT. WALL joined the conversation and spoke up and said she told VOGT the ATF talked to her. WALL said VOGT asked for our names and "grilled" her because he wanted to know exactly what we asked her. During the conversation WALL mentioned that VOGT has Post Traumatic Stress Disorder.

**<u>Search Warrant – Vogt's Residence</u>**

45. On February 25, 2025, I appeared telephonically before Judge Joi Elizabeth Peake, U.S. Magistrate Judge and obtained a search warrant for VOGT's residence on Mountain View Drive, Kernersville, North Carolina based on probable cause established by the investigation described above. [1:25-mj-56].

46. On March 5, 2025, at approximately 1:00 p.m., Veteran's Affairs (VA) Investigator Kevon Arroyo and I met VOGT at his residence. I explained to VOGT the

federal search and seizure warrant for his residence. A total of thirty-five (35) firearms, various types of ammunition, and batteries from firearm accessories were recovered. Some of the firearms were loaded. While the search warrant was being executed by personnel from the ATF Greensboro Field Office, ATF Task Force Officer Cameron Avery and I interviewed VOGT. I read VOGT his rights. VOGT stated he understood his rights and agreed to waive them, then signed the waiver form. VOGT confirmed WALL was his nurse-aide appointed by the VA. VOGT admitted to asking WALL to purchase firearms for him, to which she agreed.

**Administrative Forfeiture Proceeding**

47. ATF initiated an administrative forfeiture proceeding with respect to the firearms seized from VOGT's residence.

48. On April 23, 2025, ATF received a claim from Hannah Burnette, the daughter of Lonnie VOGT, claiming ownership of the Assorted Firearms. Upon receipt of the claim, ATF terminated the administrative forfeiture process and referred the seizure of the Assorted Firearms to the U.S. Attorney's Office for judicial forfeiture.

**Subsequent Investigation**

49. I examined the 35 firearms seized from VOGT's residence and determined that two should be returned to the original purchaser (OP). The remaining 33 firearms are the subject of this forfeiture action. As to these 33 firearms:

a. 18 firearms (#1-18 on Schedule 1) were purchased by WALL from various FFLs. I obtained and reviewed Form 4473 completed for each transferred firearm and determined that as to each one, WALL stated

she was the actual transferee/buyer of the firearm. Based on this investigation and the pattern of straw purchases acknowledged by VOGT and WALL, I believe these statements to be false;

b. one firearm (#19 on Schedule 1) is untraceable because the serial number is obliterated;

c. 14 firearms (#20-33 on Schedule 1) were traced to OPs other than WALL in transactions predating the seizure by approximately 9 months to more than 10 years. I attempted to interview the four OPs who purchased firearms within the last two years. One was deceased; one could not recall how he disposed of his firearm; two others stated they sold their firearms to "Gilley," believed to be the individual identified by WALL as someone to whom VOGT sold firearms (see paragraph 41 above).

50. In addition, the firearms on Schedule 1 were evaluated by ATF Interstate Nexus Examiners who determined that the listed firearms traveled in or affected interstate or foreign commerce.

<u>CONCLUSION</u>

51. Based on the foregoing, there is probable cause to believe VOGT received and possessed the Assorted Firearms in knowing violation of 18 U.S.C. § 922(g)(4) and they are therefore subject to forfeiture pursuant to 18 U.S.C. § 924(d).

52. Based on the foregoing, there is also probable cause to believe the firearms identified as Items 1 through 18 on Schedule 1 were involved in straw purchases in knowing violation of 18 U.S.C. § 922(a)(6) and are therefore subject to forfeiture pursuant to 18 U.S.C. § 924(d).

This the 19th day of December, 2025.

TREVOR MAYES Digitally signed by TREVOR MAYES
Date: 2025.12.19 15:47:55 -05'00'

Trevor Mayes
Special Agent
ATF